| Judge: | Right, this is the matter of Cristian Diaz Ortiz, 208-289559 and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. These are two bond hearings we had scheduled this morning. They're separate bond hearings and it turns out that both of these respondents have secured the services of an expert witness to testify generically about certain things that are part of both of their cases. So we determined that we'll take – record the testimony of the witness jointly to start with and then we'll separate the two cases and hear the individual merits (inaudible). |
|---|---|
| Judge: | So, um, do you swear that any testimony you give today will be true? |
| Professor Nolan | I do. |
| Judge: | Thank you. State your name for the record. |
| Professor Nolan | Thomas Nolan. |
| Judge: | Alright, thank you. Is the government stipulating to the expertise? |
| Government | Yes your honor. |
| Judge: | Okay. So one of the student attorneys has questions for you. |
| Student | Professor Nolan, can you please tell us about 28 CFR, part 23? What is it? What does it do? And what is its purpose? |
| Professor Nolan | CFR, part 23 is the Federal Regulation that governs criminal intelligence databases and the information they can be input into criminal intelligence databases. |
| Student | And so what is its purpose? Why does this matter? |
| Professor Nolan | Um, the purpose of 28 CFR, part 23 is to ensure that across the spectrum of criminal intelligence enterprises, and specifically, ah, fusion centers, that the information that is put into databases across the country and across the United States territories follows essentially the same rules of the game. So that the – there are guidelines, requirements that dictate the types of information that can be put into these databases. |
| Student | And what is a fusion center? |
| Professor Nolan | A fusion center is essentially a – a multi-agency inter-jurisdictional entity. There are 76 of them in the United States and its territories. There are 2 in Massachusetts and these are entities that are set up. They are collaborative, um, engagement with intelligence gathering, intelligence analysis and intelligence dissemination. Fusion centers were – they've existed in small |

|  | numbers since the 1990s but what primarily stood up in the aftermath of the 911 terrorist attacks and the accusations that, that followed that intelligence was had and possessed by various federal law enforcement agencies that wasn't shared. So the idea in establishing fusion centers was that you would have these regional entities that would, um, collaboratively collect information. So in fusion centers, and part of what I did I worked in the Department of Homeland Security in its Office of Civil Rights and Civil Liberties. And my primary function was to travel the United States and deliver training at fusion centers in The Constitution, Civil Rights and Civil Liberties and the provisions of 28 CFR, part 23.<br>So the fusion centers will collect information and no two fusion centers in the United States, and there are 76 of them now, no two fusion centers are identical. There are different personnel who staff the fusion centers depending on who is making decisions about what kind of intelligence has value. So in Massachusetts, for example, the two fusion centers, one is housed and essentially owned by the Massachusetts State Police and is housed in Maynard. And the second fusion center is a – so the Maynard Fusion Center is a primary fusion center – a primary fusion center. There's one in each of the 50 states and the District of Columbia. The primary fusion center is one that has a largely funded by the Department of Homeland Security and has a Federal presence. There are also recognized fusion centers that may or may not have a Federal presence. And, for example, the Boston Regional Intelligence Center is a recognized fusion center. And that is housed in the Boston Police Department in its headquarters. |
|---|---|
| Student | Thank you. And so have you read the Homeland Security investigation packet submitted by the government in relation to ▇▇▇ request for bond? |
| Professor Nolan | Yes I have. |
| Student | And have you reviewed the information contained within the packet that was drawn from the Boston Regional Intelligence Center's Gang Assessment Database? |
| Professor Nolan | Yes I have. |

| Student | I'm referencing the September 28th memo from ▮▮▮▮▮▮▮, your honor. So is the Bric Gang Assessment database required to comply with 28 CFR, part 23? |
|---|---|
| Professor Nolan | Yes it is. |
| Student | Why? |
| Professor Nolan | Because it's an inter-jurisdictional shared database, meaning it's not a stand-alone database that's only accessible to Boston Police Department personnel as evidenced by the so-called gang packet. Other agencies have access to the information contained in the gang assessment database. And other agencies input information into the gang assessment database. So in that it is a shared criminal intelligence enterprise, it is required to be 28 CFR, part 23 compliant. |
| Student | And so does the Boston Police Department have any policy regarding compliance with 28 CFR, part 23? |
| Professor Nolan | Yes it does. |
| Student | And would you mind describing this rule for us? |
| Professor Nolan | So it's a rule in the Boston Police Rules and Procedures, Rule 335 where, and this governs their gang assessment database – the database that we're talking about now, and in part, Rule 335 says, acknowledges that the BRIC gang assessment database is required to be CFR -- 28 CFR, part 23 compliant, and it also says that, inclusion as a verified gang member in this database is evidence of a reasonable suspicion of criminal activity. And, as such, is included in the database. |
| Student | And so why is Boston Police Department Rule 335 in compliance with 28 CFR, part 23? |
| Professor Nolan | It's only partly in compliance in my opinion with 28 CFR, part 23. |
| Student | And can you tell us how it differs? |
| Professor Nolan | We, ah – The part of the Rule 335 that says that if an individual is included in the gang assessment database, as a "verified gang member," that that constitutes reasonable suspicion of criminal activity and as a result that information is appropriately included in the gang assessment database. |
| Student | Okay, so now to get to the really nitty gritty parts, so you viewed the HSI packet, and so you've seen that ▮▮▮▮▮▮▮ was assigned 8 points for being the victim of a rival group. Was the |

|  | assignment of 8 points for being the victim of a rival group improper in your opinion in compliance with the regulation to allow information to be entered into the BRIC database? |
|---|---|
| Professor Nolan | In my opinion, it was improperly included as it contains no evidence of reasonable suspicion of criminal activity or even any criminal predicate. |
| Student | Is it enough to simply say that ▓▓▓▓ was a victim of a fight? |
| Professor Nolan | To be included in the gang database and not to be in compliance with 28 CFR, part 23. |
| Student | Is it enough to simply say that the other student was a member of the gang? |
| Professor Nolan | No, it's not. It's an association. It's a contact. |
| Student | And is it enough to simply say that the fight was documented by school police? |
| Professor Nolan | In the packet that I examined, I didn't see any such documentation. |
| Student | Okay, and so was the assignment of 5 points for intelligence from school police improper in your opinion in compliance with the regulation to allow information to be entered into the BRIC database? |
| Professor Nolan | Yes, in my opinion it was improperly included and it was not in compliance with 28 CFR, part 23. |
| Student | And can you tell us why? |
| Professor Nolan | It's a.- "an intelligence report" – it's a one page document. It's written by the school police – The Boston School Police are special police officers and are unarmed – essentially security guards. I'm unsure as to whether or not they are even authorized persons to submit data to the BRIC. Assuming that they are, the information that was contained in that, what they called an intelligence report, seemed to document nothing other than a number of individuals being in contact with each other. |
| Student | And so why is it not enough to simply say that ▓▓▓▓ was seen with other alleged gang members? |
| Professor Nolan | Because there's no evidence of any reasonable suspicion of criminal activity. In order for that to be appropriately and lawfully included in the database, there has to be specific, articulable facts that attest to the reason why the person preparing the report |

191819678 v1

4

|  | |
|---|---|
|  | believed that there was criminal activity - that there was suspicion of criminal activity. And how that criminal activity related to gang activity. And that's not included in that school police report. |
| Student | And so DHS also included verification reports of the other individuals. Are these other verification reports of the other individuals in compliance with the Federal regulations? |
| Professor Nolan | None of them are. |
| Student | What are the specific issues that you've identified? |
| Professor Nolan | It documents contacts and associations. So, in each of the other verified gang assessment reports that I reviewed, they largely consisted of a number of individuals being seen with each other and being together. And there isn't anything that I saw that constituted reasonable suspicion of criminal activity. So it shouldn't be included in a gang database or a criminal intelligence database. |
| Student | And so should these verification reports have been included in DHS's evidence in your opinion? |
| Professor Nolan | In my opinion, no. |
| Student | And why not? |
| Professor Nolan | Because, again, not to be redundant but there's no articulation of any suspicion – reasonable suspicion of criminal activity. And that is mandated – required – in order for the information to be appropriately included in a criminal intelligence database. |
| Student | And so, how many of these seven reports should be included in the absence of these errors? |
| Professor Nolan | I have to look at each individual one of them, but my review yesterday, I saw that – I couldn't see that any of them are appropriately included in gang database. |
| Student | And so turning back to ▮▮▮, of the 13 points assigned by the BRIC Gang Assessment database, how many should ▮▮▮ have in the absence of the errors you've identified? |
| Professor Nolan | Zero. |
| Student | In your opinion were there any other problems with the points assigned to ▮▮▮ in the BRIC Gang Assessment database? |
| Professor Nolan | Well one was certainly it – I was concerned that there was a document that was called an intelligence report was – that was prepared by the school police and just to characterize this, school |

|  | |
|---|---|
|  | police are not Boston Police officers they don't work for the Boston Police Department. They work for the Boston School Department. And they prepared a document that they called an "Intelligence Report" which documented contacts. So, in characterizing that as an Intelligence Report of the gang assessment database, whoever input the information assigned five points. In other areas of Rule 335, a simple contact is two points. So it's unclear to me why in one context, in one situation, a contact between two alleged gang members gets you two points in the system and in another context when the school police write something and call it an "intelligence report," that number jumps to 5. So there's an inconsistency there. Even if there was any kind of articulation of reasonable suspicion of criminal activity, which there isn't, there's an inconsistency in how contacts are characterized by the people who are putting the information into the database. |
| Student | And so is there any universal agreement across law enforcement agencies about how gang members should be identified? |
| Professor Nolan | There are advisories that the Department of Justice prepares for law enforcement. There's no requirement. There's no set standard nationally of the criteria that – that needs to be included or should be included in assessing whether or not an individual is a member of a gang. But, the Department of Justice and the FBI do provide guidance and suggestions as to what... In fairness to – to the BRIC, they substantially – they follow the Federal guidance. But nonetheless, the guidance itself and the inclusion, the criteria that Boston Police Department uses, I mean I speak from experience, I was a Boston Police officer for 27 years, the criteria that the Police Department has identified has various categories that constitute when – when identified and enumerated and you add it up to a 10 point sum total, most of those criteria themselves are not evidence of any reasonable suspicion of criminal activity. So they'll say, for example, the Intelligence Report. Or they'll say that someone, a Media Report, or information from another agency and without specifically articulating what the criminal activity supposedly is, the information should not be included in the database. |

| Student | And so who is responsible for entering information into the BRIC Gang Assessment database? |
|---|---|
| Professor Nolan | Different people have the authority to enter information. People who are assigned to the BRIC. The BRIC is under the overall command supervision of – of a Boston Police officer at the Superintendent grade, which is next to the Police Commissioner. But the actual analysts could be civilian analysts. I've been to the BRIC a number of times and there are sworn Boston Police personnel who work there, detectives, there is a sergeant detective assigned there. There are also civilian analysts and this is a position where people who want to do intelligence analysis will work and they're not sworn police officers. So it could be any number of different people putting data in. |
| Student | And are all these parties who enter information into the BRIC Gang Assessment database required to comply with 28 CFR, part 23? |
| Professor Nolan | They are required to undergo training and have any awareness of the provision and the requirements with 28 CFR, part 23. I'm not sure whether or not they do it. There's an online training. It's not something that's particularly comprehensive. But there is a requirement that people who are putting information into criminal intelligence databases complete that training. |
| Student | And so, what is your opinion on HSR's reliance on information about ████ that was drawn from the BRIC Gang Assessment database? |
| Professor Nolan | The information is unreliable. |
| Student | And do you have anything else that you would like to add? |
| Professor Nolan | I think, and to go back, the reason that there needs to be consistency across the spectrum of these fusion centers and agencies that are putting in information is so that intelligence analysts and law enforcement personnel who might be in Los Angeles for example, can rely upon the data that's being put in by the Boston Regional Intelligence Center as being reliable indicators of the activity that's being described. So, and that's why 28 CFR, part 23 exists. So if different criteria are being used, so , if someone is being called a gang member – a verified gang member by the Boston Regional Intelligence Center, it's |

| | |
|---|---|
| | corresponding to the fusion center in Seattle or Washington DC or Los Angeles, needs to be able to rely on information as being accurate and truthful and reliable. And so, in looking at decisions about whether or not someone is a "verified gang member," people who are asked to review this material are being asked to accept on face value that the information is accurate and reliable and it is not in my opinion. |
| Student | Thank you Professor Nolan. Thank you, your honor. I have no further questions. |
| Judge | So, Attorney Scordino, do you have questions for him with regard to your client? |
| Ellen Scordino | Yes, I do have questions specific to- (inaudible interruption) |
| Judge | And one of you – let her ask some questions. |
| Ellen Scordino | Your Honor may I approach and hand Professor Nolan a copy of the August 21, 2018 Homeland Security letter that's related to… |
| Government | Why, your honor? I object. |
| Judge | I haven't seen the Order -- so did they submit it already? |
| Government | Is it the Gang packet? |
| Ellen Scordino | This is the Gang packet that was provided by DHS to us |
| Government | Is his memory exhausted? He just testified that what was in it was unreliable. |
| Judge | She was just (inaudible) |
| Government | I object to that your honor, unless (inaudible) witness, unless he says he can't.. |
| Judge question | Well, hold on a second. He's already reviewed this, right? |
| Government | Right. |
| Ellen Scordino | Your honor he has but he's had to review multiple bonds and I thought it might be more convenient if we could- |
| Judge | Well let's see – let's ask him first. |
| Ellen Scordino | Sure. |
| Judge | But you've already submitted – or it's been submitted |
| Ellen Scordino | Correct. |
| Judge | Okay. I don't think he's gonna need it. He didn't need it for the last ones. |
| Ellen Scordino | Sure. Professor Nolan, so you recall reviewing the Department of Homeland Security's letter with respect to Cristian Ortiz? |

| | |
|---|---|
| Professor Nolan | Yes I do. |
| Ellen Scordino | Ok, and in that letter, did you see that they included information from the BRIC database? |
| Professor Nolan | Yes I did. |
| Ellen Scordino | And how many BRIC files have you reviewed in your career? |
| Professor Nolan | Many. Particularly this year since I started looking at these, um, gang packets as their so-called, dozens. |
| Ellen Scordino | And how would you compare the strength of Cristian's BRIC file in comparison to other ones that you've seen? |
| Professor Nolan | I'd say that this particular file is among one of the weakest that I've seen. |
| Ellen Scordino | And do you recall that within the BRIC file there was a summary of the verification report? |
| Professor Nolan | Yes I do. |
| Ellen Scordino | And that's where they assign points, correct? |
| Professor Nolan | Yes, that's correct. |
| Ellen Scordino | And if you were to look at the number of points assigned to Cristian, how many would – how many do you think are reliable in that report? |
| Professor Nolan | Zero. |
| Ellen Scordino | And if you were to assign points to him on the exact same information that was in that file, how many points would you assign Cristian? |
| Professor Nolan | I'd assign zero points. |
| Ellen Scordino | And did you notice that throughout the report at some points Cristian is identified as an associate member? |
| Professor Nolan | Yes. |
| Ellen Scordino | And at other times he is identified as a verified member. |
| Professor Nolan | That's correct. |
| Ellen Scordino | What's your understanding of – of the difference or the step from going from an associate to a verified member? |
| Professor Nolan | An associate would be someone who is suspected of having an affiliation with the gang but has not reached that 10 point threshold where that individual would then be considered for purposes of the BRIC to be a verified gang member. |

| | |
|---|---|
| Ellen Scordino | And so, if going chronologically in Cristian's report and the contacts, after four contacts Cristian was identified as a gang associate. Do you recall that? |
| Professor Nolan | Yes. |
| Ellen Scordino | And then on contact number 5, he is first identified as an MS-13 gang member, correct? |
| Professor Nolan | Yes. |
| Ellen Scordino | And did you see any indication or reasoned basis for moving Cristian from being a gang associate to being a gang member? |
| Professor Nolan | In the packet that I reviewed, there was no new information provided that would indicate why or the basis on which – that this individual was moved from the category or being a suspected or an associate gang member to a verified gang member. |
| Ellen Scordino | And what does it say as to the reliability of the report if 5 contacts later Cristian is now back to being an associate member? |
| Professor Nolan | It would indicate that new information that has been put in is – and I've seen this across many of the gang assessment database reports - is it's evidence of what I would characterize sloppy work. Where you've got contacts and contacts only. So this individual was seen with that individual and it hasn't articulated, again, any reasonable suspicion of criminal activity that any of the individuals named might be involved in. So you have a situation where someone is seen by someone – by, for example, a school police person, leaving school together. And so they had a contact. And they write that up as something that constitutes 2 points to be input into the gang assessment database. |
| Ellen Scordino | Was there anything other than contacts that led Cristian to now be identified as a verified MS-13 gang member in this report? |
| Professor Nolan | In Cristian's case there was nothing other than contacts with other individuals who were purported to be gang associates or verified gang members. |
| Ellen Scordino | And so did you see any articulation of fact related to criminal activity in this report? |
| Professor Nolan | I did not. |
| Ellen Scordino | Did you see any articulation of facts related to the suspicion of criminal activity in the report? |
| Professor Nolan | I did not. |

| Ellen Scordino | And did you see any articulation of facts that articulate how Cristian's behavior is related to gang activity? |
|---|---|
| Professor Nolan | I did not. |
| Ellen Scordino | Your Honor, I have no further questions. |
| Judge | You had a question? |
| Government | Yes, please your honor. Sir, according to your affidavit, you do not feel that the BRIC is in compliance with 28 CFR, part 23, is that correct? |
| Professor Nolan | Yes. |
| Government | In toto? The whole thing? Not compliant? |
| Professor Nolan | No, in part – in relevant part that I'm testifying to today. |
| Government | Can you articulate that for us? |
| Professor Nolan | That the Gang Assessment database, the Boston Regional Intelligence Center collects other information. It's not specifically related to gang membership or gang verification. My contention is that in my opinion, that the Gang Assessment database is for the large part not in compliance with 28 CFR, part 23. |
| Government | Alright, and you testified on direct that the HSI packets are not accurate. Is that a fair statement of what you said, yes or no? |
| Professor Nolan | Yes. |
| Government | And you also stated that the HSI packets were not truthful? Is that a fair statement, yes or no? |
| Professor Nolan | No. |
| Government | Okay. I recall that the packets are not accurate, truthful or reliable. Do you retract any of that now? |
| Professor Nolan | They're not accurate. They're not reliable. I believe that the people that input the data into the database believe that it's truthful. Whether or not it is, in fact truthful, is subject to interpretation. But the information is not accurate and it's not reliable. |
| Government | So the truth is subject to interpretation? |
| Professor Nolan | Yes. |

| Government | So in your mind, the truth is subject to interpretation? I just want to get that straight. |
| --- | --- |
| Professor Nolan | The truth of the information that the analysts or the officers are putting into the database I believe they probably believe that it's truthful information. It's not accurate information and it's not reliable information, but my contention is that the people who are putting the information into the database probably believe that it's truthful. |
| Government | In regard to Fusion Centers, do you believe that Fusion Centers are an unholy alliance among Federal, state and local law enforcement? |
| Professor Nolan | They can be, yes. |
| Government | Do you believe that the immigration police have demonized "the other"? |
| Professor Nolan | In many cases, yes they have. |
| Government | And do you believe that there's an increase use of deadly force against people of color? |
| Professor Nolan | Yes I do. |
| Government | And do you believe that the immigration individuals are marginalized individuals in our society? |
| Ellen Scordino | Objection, this is beyond the scope of direct. |
| Judge | Cross Examination. I wasn't aware that you limit on your cross examination to that. So, overruled. |
| Professor Nolan | Could you repeat the question? |
| Government | Certainly. This is in regard to perilous policing, I believe your (inadible) is coming out in 2019? Where you refer to the, um, some of the immigration people that were arrested by HSI and the ERO as marginalized individuals. Is that how you see them? |
| Professor Nolan | Some of them, yes. |
| Government | What do you mean by perilous policing exactly? |
| Professor Nolan | So, it's a title. It's a part of a title of a book that is in print production that will be published in April of 2019. Perilous Policing is my way of characterizing policing as being something that is fraught with potential danger and peril for the police as well as for people who are constituent communities and particularly communities of color. |

| Government | Within that book, I believe you refer to the erosion of police narrative? Is that a fair statement? |
|---|---|
| Professor Nolan | Yes. |
| Government | What is that exactly? How do you define erosion of the police narrative? |
| Professor Nolan | So historically the narrative that the police have employed in describing incidents in which they become involved. And I specifically refer to deadly force incidents in which the individuals are people of color, that the narrator historically has been unchallenged. That the Police have rendered a version of events that is typically characterized by them being in fear for their lives and that deadly force response is warranted, justified and appropriate. My contention in my book is that, particularly in the aftermath of the 2014 shooting death of Michael Brown by police in Ferguson, Missouri, and the widespread use of recording technology, that that narrative that has withstood, my contention is, the test of time and been relatively unchallenged, is now undergoing an unprecedented challenge. So people are skeptical of the police version of events. People are doubtful and in many cases people challenge that narrative version of what the police are doing. |
| Government | So this comports with your statement earlier that there's a marked increase of deadly force by the police used against people of color, is that correct? |
| Professor Nolan | There is a significant increase in the challenging and the questioning of the incidents of deadly force against people of color and specifically African American men and women and even boys and girls. So in proportion to the numbers in the population, African Americans are targeted and are victims of deadly force incidents in numbers that – that outweigh their white counterparts. |
| Government | And stated before that, in large measure, the BRIC is not compliant with 28 CRF, part 23. You also in your affidavit refer to the BRIC as a "so-called gang database". So you do not feel that it is a gang database? Or that it is at least inferior? |
| Professor Nolan | It's a gang database that is not in compliance with 28 CFR, part 23. That is my contention. |

| Government | And is that the same contention to go towards another part of your affidavit where the BRIC gang assessment database is an "intelligence project". Do you not feel that the BRIC is an intelligence project, it is just simply called or labeled as one? Is that your (inaudible)? |
|---|---|
| Professor Nolan | No, I put it in quotation marks because that's the language that's contained in 28 CFR, part 23. I meant no way to disparage the BRIC as an intelligence product. Simply to characterize it as such. |
| Government | Thank you, no further questions. |
| Ellen Scordino | Your honor, I have one question on re-direct. Professor Nolan – It sounds like you're an author, at least – you have ideas with respect to peril policing that sister counsel asked you about. Do you believe that anything contained in that book or your beliefs about the erosion of the police narrative that prevent you from objectively looking at the BRIC database and the files presented to you here today? |
| Professor Nolan | No, in no way. |
| Ellen Scordino | I have no further questions. |
| Judge | Do you have any other questions? Government? Alright, thank you. |
|  |  |
|  |  |
|  |  |

**Bond Hearing Continued (Specific to Cristian Ortiz)**

| Judge | This is the matter of Cristian Diaz-Ortiz, 208-289-559. This is a bond hearing in the Boston Immigration Court, Boston, Massachusetts. Judge Paul Gagnon residing. It is October 22, 2018. Counsel please introduce yourselves to the bench. |
|---|---|
| E. Scordino | Ellen Scordino, with Cooley, LLP, pro bono counsel for Respondent. I'm here with attorney Serg Banini, also from Cooley. |
| J. Rosha | Joceline Rosha, assistant chief counsel for the Department of Homeland Security. |
| E. Scordino | Your honor, we are here requesting release on conditional parole or in the alternative on bond, for Cristian Diaz-Ortiz. Cristian is not a danger to society and he is not a flight risk. Cristian has been living in East Boston since 2015, he has never been arrested or charged or convicted of any crime. He has a full time job working at a bakery. He has a stable and supportive family, one wherein he has responsibilities of taking care of junior family members. He attended school and was a member of the junior ROTC program there, and has spoken on aspirations of joining the armed forces. We have as part of the motion for bond, submitted a letter from the JROTC instructor. We received the Government's evidence at the last hearing date, and we can certainly go through it and respond to sister counsel as appropriate, but there is nothing there sufficient to prove that Cristian is a danger. Instead it is filled with innuendo based on associations with neighborhood kids, classmates and folks that he works with. This is not surprising, these are kids who speak the same language, who are from the same country, and who have similar life experiences. In fact, if you look at what |

|  | is alleged to be gang activities, it's sort of normal, teenage hangout activities. None of the activities that are described in the gang packet are harmful or criminal. There are no allegations of either. We heard from Professor Tom Nolan that what was in that packet was inherently unreliable. We can point out many of the errors that are in Cristian's packet.<br><br>With respect to not being a flight risk, Cristian has previously filed an SIDJS application, as he came here as an unaccompanied, abandoned minor and he had been going to and had been appearing at every court date. His only family here in the Unites States is here in Boston, where he lives with his aunt and uncle. He can't support himself and so he would stay with them and he also does have a fear or returning to El Salvador. Also his attorneys are here in Boston. |
|---|---|
| Judge | What do you mean his attorneys are in Boston? Oh, you mean you are in Boston, ok, got it, thank you. Ok. So what does he have pending now for relief? |
| E. Scordino | He has a SIDJ application – and so he filed that – he came here in 2015 where he was picked up at the border and he was released to his aunt and uncle and he has been living here peacefully since then. He was picked up most recently as they were looking for, for someone else with a warrant. It actually describes it as him being a collateral. And although that report says that he is a gang member, if you look at the preceding FIO reports – he's not – he's identified most recently as an associate member, meaning, he didn't even have the points. |
| Judge | You were saying he is in junior ROTC? |
| E. Scordino | That's right. |

| | |
|---|---|
| Judge | Is he still in school? |
| E. Scordino | He's not currently in school. He was working full time when he got picked up. So if you look at tab six of the bond motion, that's a letter of support from Rigoberto Valez, who is the instructor of that program. We also attached pictures, and uh, a letter from his aunt to sort of – describing how proud he was. So if you look at, I think it's tab, sorry, thirteen, he was super excited about it. When we talk to him about it he talks about, you know, being strong and wanting to join the military. He sees that as a way to be proud and strong and live here in the United States. |
| Judge | Alright, Ms. Rosha? |
| J. Rosha | Your honor. There is nothing here that indicates that he has permission to be working in the United States, also, uh, there is a problem in the US military in that, there have been many gang members that have joined the army, or other armed forces, but particularly the army, and the army slowly began to realize they did this in order to learn how to strategize and learn how to use weapons and how to become weaponized. Not to serve the country. Many of them wash out, but not before they've had the training that they sought when they joined. The criminal packets here, the gang verification packet, is replete with page after page of – page 26, on page 30, 31, uh, all the way through the Respondent left school or was found on school property constantly smoking pot, blunts, found with marijuana pills. Also on the November 2017 on page 27, the school police saw a student wearing a full face mask, and he met with the associate – MS13 associates mentioned below, and one of them is the Respondent. The Respondent Ortiz. In the totality of the circumstances, and over a span of time, there's |

|  | |
|---|---|
|  | ample documentation showing that it's not just common language, over and over and over again – who meets with someone in a full face mask on school property? Who smokes pot on – relentlessly on school property until being caught? This is day after day – gang – page after page of Mr. Diaz-Ortiz comporting with gang members. As a matter of fact, he was quite familiar with an individual from the last hearing you'll see that, uh, on one of the pages that he was actually sitting on the front stairs of 195 Brook St smoking pot with that particular individual, on November 2017. There's ample proof here to show that this individual is a verified gang member, and as such, he is a danger to the community. On that the department rests your honor. |
| E. Scordino | Sir if I may respond? Because we too asked about the full face mask and I brought some pictures of actually what was being worn and I also spoke with ▇ ▇▇▇▇▇▇▇▇▇▇▇▇ who lives in ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ who has seen these at school. |
| J. Rosha | Objection. There is no basis for that, there is no foundation, their just drawings. |
| E. Scordino | These are the full face masks, hooded sweatshirts that latin artists wear that kids emulate. That's exactly what that gentleman was wearing, and actually if you read that report, it says that police approached this fully masked individual and had a casual conversation. It's also wintertime, when I think the innuendo that sister counsel would like us to draw from that interaction is inappropriate. So even without the pictures, it does not seem that the police officers who faced the masked individual were in anyway afraid of thought something was amiss. I also think that the innuendo, or the unspecific statements that he |

|  | has been on school property multiple times smoking marijuana, I think if you go through the file, in fact, once he was on the school property smoking marijuana, once he was on the front steps smoking marijuana, once he was in the park smoking a cigarette by himself and at no time did the police officers ever take the marijuana. He never had a large enough amount for it to have been considered criminal and they just told him to move on his way and smoke someplace else. So the Government is asking you to – to hold this man without his civil liberties with no evidence of dangerous activity. |
|---|---|
| Judge | Anything else? |
| Ellen Scordino | No your honor. |
| Judge | Anything else from the Government? |
|  | No. |
| Judge | Alright, I'm moving to (inaudible) no bond. I will reserve your right to appeal in an appeals (inaudible) on November 21st. |
|  |  |
|  |  |
|  |  |
|  |  |